Filed 7/19/24  P. v. Pedroza CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LUIS MONDRAGON PEDROZA, <br><br> Defendant and Appellant. | D081562 <br><br><br> (Super. Ct. No. SCE376961) |


APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

On the evening of December 12, 2017, Luis Mondragon Pedroza, Chris O., and Francisco M., all three members of the El Cajon Hoodlums, went into rival gang territory, intending to start a fight.  They approached a group of

three individuals at a park, at least two of whom were known members of 380 Block, and an altercation ensued.  Around 15 additional 380 Block members joined the fight.  Allegedly fearing for his own life, Pedroza took a knife from his pocket and stabbed three individuals, killing one and severely injuring two others.  Pedroza was 18 years old at the time of the altercation and was ultimately tried as an adult.  A jury acquitted Pedroza on an alleged count of first degree murder, but found him guilty of one count of second degree murder and two counts of assault with a deadly weapon.

On appeal, Pedroza asserts the trial court erred by admitting rap lyrics he had written in 2016 and excluding testimony from an expert on adolescent brain development, and that the prosecutor misstated the law regarding self-defense in a group attack situation during his closing argument.  Although we recognize that the law is evolving as to both the admissibility of rap lyrics and the significance of adolescent brain development, we find no reversible error in this case and affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged Pedroza with one count of murder, pursuant to Penal Code section 187, subdivision (a), as to victim Kyle K., and two counts of assault with a deadly weapon pursuant to Penal Code section 245, subdivision (a)(1), as to victims Edwin R. and Kevin B.  They further alleged that Pedroza committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang, and that he personally used a dangerous and deadly weapon, to wit:  a knife, in the commission of each.  Pedroza pled not guilty and the trial court granted a motion to bifurcate the gang allegations pursuant to Penal Code section 1109.

At trial, Pedroza conceded that he went to the park on December 12, 2017, looking to start a fistfight with members of the 380 Block Gang; that he had a knife in his pocket; and that, during the fight, he took out his knife and started swinging it around, ultimately stabbing Kyle, Kevin, and Edwin. However, he claimed that he did so in lawful self-defense, after being surrounded and outnumbered, struck in the head with a bat, and almost run over by a car. Accordingly, much of the evidence at trial centered around the details of the altercation, as described by different eyewitnesses, and Pedroza's mental state.

## A. The People's Case

San Diego Police Sergeant Travis Howard testified as a gang expert. He explained that respect is important in gang culture, and that if a gang is disrespected, there is an expectation that its members will respond with violence. He confirmed that Pedroza, Chris, and Francisco were all members of the El Cajon Hoodlums and that the Hoodlums were an established gang in the area. The Hoodlums were rivals with the El Cajon Locos and 380 Block, a subset of the Locos. The primary territory of 380 Block was an apartment complex called Key Largo, adjacent to a city park where the charged crimes took place.

In the month or so leading up to the charged offenses, Pedroza, Chris, and Francisco photographed themselves in 380 Block territory. Pedroza posted one of the photographs on social media with a caption that read, "Isn't this where we post stuff at? We here." 380 Block members tagged a stop sign in Hoodlum territory; spray painted over a Hoodlum tag and posted it to social media; and, a week before the stabbings, Pedroza and Chris tagged a wall in the city park in 380 Block territory. Sergeant Howard explained that these actions were signs of disrespect.

3

On the evening of December 12, 2017, Pedroza's girlfriend drove Pedroza, Chris, Chris's girlfriend, and Francisco to the park. Chris's girlfriend had texted Pedroza's girlfriend earlier that day, concerned that Chris was going to "get active," presumably based on the recent challenges amongst the two rival gangs. When they arrived at the park, they saw three men in a group. Pedroza said "there are some fools there," and the three men got out of the car and walked towards the other group. Chris's girlfriend got out of the car at one point, but Chris told her to go back. She saw a lot of people running and a white SUV driving erratically, trying to run them over. All three men eventually came back to the car and they drove away. The white SUV was following them, so Pedroza's girlfriend drove fast, running red lights. While they were driving, Pedroza said, "I think I stabbed someone."

Sam S. testified that he was at the park at around 11:00 p.m. that evening, visiting with friends, including Kyle. A car pulled up and three or four people got out. They asked if Sam was in a gang and he said he was not, but one of Sam's friends said that he was from 380 Block. Someone with long hair punched Sam and a fight broke out. Sam repeated that he was not from a gang and the other individuals involved in the altercation allowed him to get up and walk away. Sam said there were about 15 people fighting, including Kyle and the men from the car. He did not see any weapons but he did see Kyle fall to the ground, holding his stomach.

Edwin testified that he went to the park with Kevin that night, but the two separated at some point. Edwin ran into Kyle and Kyle offered him a cigarette. They were smoking near Kyle's car when Edwin heard someone yelling for help. He then heard Kevin say something like "they were trying to jump us," and saw three individuals chasing Kevin. When the three

4

individuals saw Edwin and Kyle, they turned around and ran the other direction, towards the car that they came in. Edwin and Kevin followed them. Someone called Edwin by his name and when he looked over, they punched him in the face, breaking his nose. Edwin believed that Chris was the individual that hit him, and that Chris was wearing brass knuckles.

They continued to fight and, eventually, Chris ran away towards the street. Kyle followed Chris. Edwin noticed someone "creeping between cars." He pushed Kyle behind him and began fighting with the individual, who he later confirmed was Pedroza. According to Edwin, Pedroza was losing. Pedroza took out a knife and stabbed Edwin on the left side, knocking the wind out of him. Edwin caught his breath and continued to fight. He attempted to block his head with his arm and Pedroza cut his arm. Edwin said that he had been stabbed, and that Pedroza had a knife. Kyle, Kevin, and a third friend went after Pedroza. Edwin believed that the third friend had a bat, but Kyle and Pedroza started fighting one-on-one. Edwin saw Pedroza swing at Kyle's chest, and then saw Kyle grab his chest and run to a nearby grassy field.

Tony P. was also at the park that evening. When he saw the fight break out, he went to his apartment to get a tire iron to use as a weapon. When he came back the fight was mostly over. He and his father attempted to render aid to Edwin and Kyle. Tony saw some others put Kyle into an SUV to take him to the hospital, and went to inform Kyle's family. Tony had known Chris since middle school, and the two of them had "beef." He stated that he had fought Chris at least twice before and that Kevin had also fought with Chris. In May 2017, Tony, Kevin, and a third individual took turns beating Chris. Tony did not really know Pedroza or any of the other Hoodlums.

An uninvolved witness called 911 to report the fight. She explained that she was at the Key Largo apartments with her mother when they heard a commotion outside. She could not see much because it was dark, but she heard metal bats hitting and saw people running everywhere. She estimated that there were about 20 people involved in the altercation, and at least two of them had bats. Later, she saw people carrying an unresponsive body to an SUV.

After Kyle was gone, Sam returned to the area and saw a knife near a pool of blood on the ground where Kyle fell. No one could identify who the knife belonged to, but several witnesses for the prosecution stated that it did not belong to Kyle, and that they did not see Kyle with a knife that evening.

The police tested the knife for DNA evidence. A forensic biologist testified that she tested various areas of the knife, and that Kyle's DNA was consistent with a 63% contributor to a sample from the handle and an 82% contributor to a sample from the sheath. She also compared the sample to a reference sample of Pedroza's DNA and found more support for exclusion than inclusion in all areas except the exterior sheet.

At the end of the altercation, Kyle, Edwin, and Kevin had each been stabbed. Kyle was taken to hospital but died as a result of his wounds. Edwin had a wound on his left side, just above his hipbone, and a second wound on his left arm. He had internal bleeding, had to have surgery, and stayed in the hospital for about a week. Kevin had a laceration to his face.

Pedroza was arrested on December 18, 2017. In the following days, the police executed a search warrant on Pedroza's home and on the car Pedroza's girlfriend drove on the night of the charged crimes. The police found a bag full of documents and notebooks in Pedroza's bedroom. The notebooks contained miscellaneous writings related to gangs, including rap lyrics titled

"El Cajon City." On the dresser, they found photographs depicting Pedroza and others displaying gang signs with their hands. In the vehicle, the police found a black ZTE cellphone that belonged to Pedroza. The phone contained a video of a rap that appeared to have been recorded by Pedroza's girlfriend on November 27, 2017, and sent to the ZTE phone on November 29, 2017.

On June 27, 2019, a confidential informant came forward to provide information obtained while sharing a cell with Pedroza. The informant had been an original member of the Hoodlums, starting when he was about 14, had been in and out of jail and prison, and had pending charges related to transporting drugs across the border. He agreed to testify in exchange for leniency in his pending case. He also received benefits in the form of rent and food subsidies while the case against Pedroza was pending, totaling about $32,000.

Pedroza shared information and discovery from his case with the informant. The documents included information about an anonymous tip the police received that mentioned the informant's name, so Pedroza and the informant began discussing who might have provided the tip. The informant said that Pedroza told him he was upset because Chris had been jumped a couple of times by 380 Block members walking home from school and he wanted to get revenge. Both the Hoodlums and 380 Block members had also been going around tagging and crossing out tags in each other's territory. On the night of the charged crimes, Pedroza and the others went "car cruising" in 380 Block territory. Pedroza did not go there to fight; he had his knife and intended to kill someone.

When they got to the park, they saw a couple of groups of guys hanging out and asked where they were from. One of the guys said 380 Block and Pedroza said "kill that shit" and "this is Hoodlums," intending to show

7

disrespect.  They started fighting and Pedroza immediately tried to stab anyone that he could.  Pedroza saw Chris knock Kyle to the ground so he ran over, jumped on Kyle, and started stabbing him.  Pedroza jumped back in the car with Chris and Francisco and they took off.  After dropping the others off, Pedroza and his girlfriend went to Imperial Beach.  Pedroza threw the knife in the ocean and burned his clothing.

**B.     The Defense Case**

Pedroza testified in his own defense.  He was 18 years old in December 2017.  He had been friends with Chris and Francisco since his freshman year of high school.  Pedroza knew that Chris had been getting jumped or assaulted on the way to and from school.  Pedroza was angry about it.  The three—Pedroza, Chris, and Francisco—planned to go to the park on December 12, 2017 so that Chris could have a one-on-one fistfight, with Pedroza and Francisco available to back him up.  The purpose was to resolve the conflict and "put this behind us."  Pedroza routinely carried a knife for his own protection, but he had no intention of stabbing anyone that evening.

When they got to the park, they approached a group of people and Chris started fighting with one of them.  Another took off running towards the Key Largo apartments and another started fighting with Pedroza.  Francisco backed off so the fight would be fair with two individuals on each side.  But then it seemed like people were coming at them from all directions.  Pedroza guessed there were about 20 people total from 380 Block, with about 6 individuals attacking each of him, Chris, and Francisco.  Pedroza was scared.  He wanted to run away but there were so many people surrounding them.  He heard someone say "run his ass over," and someone got in a car and started driving towards them.

Pedroza and his friends ran across the street, but the 380 Block members followed them and surrounded them again.  They attempted to go

8

back to the car but then people started running towards them with bats. One of them hit Pedroza in the head. Pedroza believed at that moment that he was going to die. At the same time, he was worried about the girls in the car and leaving them unprotected. He "knew at that point the only thing left to do was to pull out the knife that [he] had in his pocket." When he first pulled the knife out, he hoped that waving it around would scare the others off so he and his friends could go back to the car and leave. But he continued to be surrounded so he "put [his] head down" and "just kept swinging the knife in hopes that they would back up off of [him]."

Pedroza said that he was not trying to kill anyone, but he did know that he stabbed someone. The others eventually started to back off and he, Chris, and Francisco ran to the car and told his girlfriend, the driver, to go. The car that had tried to run them over chased them for about 10 minutes. After, they dropped everyone else off and Pedroza told his girlfriend to drive him to Imperial Beach. He knew that he had stabbed someone and was concerned that 380 Block would retaliate. He threw the knife off the pier and burned his clothing.

Pedroza admitted that he spoke to the confidential informant about his case but denied telling him that he got on top of Kyle on the ground and stabbed him. He also admitted to writing the rap lyrics in the notebook found in his room but stated that he was 16 when he wrote them, and that he was trying to make music like all his friends listened to and to portray his image as being tough. He conceded that the words referred to violence, both guns and knives, but said that he did not mean the lyrics literally.

The defense also presented its own gang expert, Francisco Mendoza. Mendoza testified about the ways in which gang members in prison share information. He explained that confidential informants are well known

within the criminal justice system, and amongst gang members. Inmates are generally expected to have "paperwork" verifying the crimes they are alleged to have committed, and that they are not an informant. However, they need to be careful who they share that paperwork with because someone may use it to learn about their case and then provide information to the district attorney in an attempt to obtain a lesser sentence for themselves. Mendoza also discussed the role of "gangster rap" in youth culture. He said that young men or boys would write their own lyrics and try to "top" one another by being provocative. He explained that while some of it is personal, a lot of it is fantasy, and these young men will write about and glamorize prison or violence, "just to sound hard."

### C. The Verdict and Sentencing

The jury acquitted Pedroza of first degree murder but found him guilty of second degree murder as to Kyle. The jury found true an allegation that he personally used a deadly and dangerous weapon in the commission of the murder. The jury also found Pedroza guilty on two counts of assault with a deadly weapon, as to Kevin and Edwin, and found true allegations that he personally used a deadly or dangerous weapon as to both, and that he personally inflicted great bodily injury upon Edwin.

The trial court sentenced Pedroza to an indeterminate term of 15 years to life for the murder, and an additional determinate term of 6 years for the two assaults.

Pedroza filed a timely notice of appeal.

## II.

## DISCUSSION

Pedroza asserts that the trial court abused its discretion by admitting the rap lyrics that he wrote in his journal and by excluding the testimony of an expert witness he proffered regarding adolescent brain development. He

10

also asserts that the prosecutor misstated the law regarding self-defense in his closing argument, and that, to the extent that his trial counsel failed to adequately object to the prosecutor's misstatements, trial counsel provided ineffective assistance of counsel.  He asserts each of these errors are prejudicial and require reversal, individually and cumulatively.

### A.    The Trial Court Did Not Err by Admitting the Rap Lyrics

In pretrial proceedings, the People sought to admit both the written rap lyrics found in Pedroza's bedroom, and the rap video found on Pedroza's cellphone.  The trial court permitted both, over defense counsel's objection.  Pedroza now asserts the trial court erred as to the written set of lyrics.  He contends the written lyrics were not admissible under either current Evidence Code section 352.2—which was not in effect yet at the time of his trial but which he now asserts is retroactive—or Evidence Code section 352.[1]  We disagree and, regardless, would find any associated error harmless.

### 1. The Rap Video Found on Pedroza's Phone

The People presented the rap video from Pedroza's phone through their first witness, Sergeant Howard.  Howard stated that it appeared the video was taken in the same car that Pedroza's girlfriend drove to the park on the night of the murder.  The People played the entire four minute video for the jury, and also provided them with a transcript of the lyrics.  At the end of the rap, Pedroza stated:

> "These vatos jumped my homie so these busters gotta pay;
> so I hit them with the left and I hit them with the right;
> I be feeling so much hate so it's always on outside
> to my homie Silent [Chris], this parts for you;
> 'cause I want to say sorry that I wasn't there for you;
> If I was never fuckin' busted, it would've never even
> happened;

---

[1]    All further unspecified statutory references are to the Evidence Code.

11

> I hate these fools with passion, always want to fucking crack them;
> to the day I D-I-E, always rep for EC;
> and when they ask you who did it, you can say it was Travi;
> taking flato [phonetic] enemies 'cause you know I handle mines;
> I'm the reason why they call up backup all the fuckin' time."

Howard explained some of the terminology used in the video. He testified that Pedroza claimed allegiance to the Hoodlums, expressed regrets about not being there when Chris got beat up, and expressed a willingness to kill. Pedroza referred to himself as a "sick one" in the rap, which means "kind of like sick in the head, crazy, loco, very violent and active." In addition, he referred to "kicking up dust," "get down," and "tighten up my shoes," all of which were references to fighting or preparing for a fight. Howard conceded that the video was not posted on social media, and that he did not know when Pedroza wrote the lyrics. However, the police forensically examined Pedroza's ZTE phone and there was evidence that the video was recorded on November 27, 2017 and sent to Pedroza's phone on November 29, 2017, about two weeks before the murder.

Pedroza does not dispute the admissibility of the video.

### 2. The Rap Lyrics Found in Pedroza's Room

The rap lyrics that Pedroza takes issue with in the present appeal were handwritten into a notebook found during a warrant search of Pedroza's residence after the murder. There is no dispute that Pedroza wrote the lyrics. The title "El Cajon City" appears on the top right corner of the page. The remainder of the page contains a chorus, written twice, and two verses.

The People showed a photograph of the notebook page at trial, and Sergeant Kai Mandelleh testified about the lyrics. Mandelleh read the following portions of the lyrics to the jury:[2]

> Saying fuck my enemies. Homie, leave them six feet deep.
> Packing a filero or packin the heat.
> We quick to dump. We quick to stick.
> Because we banging for the Big El Cajon Hoodlums clique.
>
> With the one and the tres by the mother fucking side,
> Ready to ride, ready to bust a homicide.
> I check the time and it's eight-one-two,
> El Cajon City filled with crazy ass fools.
> Six clicks deep in my mother fucking hood
> Whether we enemies we up to no good.
> Always putting in work for the big EC
> I wrote this shit when I was in Unit Charlie
> Catchin' Fades with all my enemies
> Out of town mother fuckers, this is big ass deep.

Mandelleh explained that the lyrics were relevant because, in his view, Pedroza was saying that he wanted to disparage his enemies and leave them six feet deep, or kill them. He said that "dump and stick" referred to shooting, or dumping a magazine, and stabbing, or sticking; that "ready to ride" meant ready to be active or commit gang crimes; and that 8-12 was a reference to the letters HL, or Hoodlums. Mandelleh said that he believed the first set of rap lyrics was written earlier that year, in 2017. Pedroza would have been 17 years old at the time. Although he did not explain it to the jury, to avoid prejudice, counsel explained at a sidebar that Mandelleh's opinion was based on the line "I wrote this shit when I was in Unit Charlie."

---

[2] Our recitation of the lyrics is taken from the image presented to the jury and Mandelleh's testimony at trial. Because Mandelleh interjected explanations throughout, we do not directly quote his testimony.

Unit Charlie is a reference to juvenile hall and Pedroza was released shortly before the altercation in which the stabbings occurred.

Pedroza testified that he wrote both songs when he was 16. He acknowledged that he was talking about Chris in the second but said Chris had been jumped other times in the past as well. He agreed that he recorded the video about a month before the murder.

### 3. The Trial Court Did Not Abuse its Discretion by Admitting the Written Lyrics Under Section 352

The trial court analyzed both the video recording and the written lyrics under section 352. Evidence is typically relevant and admissible if it has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) However, the trial court may exclude relevant evidence if the risk of undue prejudice, undue consumption of time, confusion of the issues, or misleading the jury substantially outweighs its probative value. (§ 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

Applying these basic principles, the trial court found the rap video and written lyrics were probative as to intent and not unduly prejudicial. We review the trial court's ruling for an abuse of discretion, and do not disturb the ruling unless it is arbitrary, capricious, or patently absurd. (*People v. Harris* (2005) 37 Cal.4th 310, 337; *People v. Jones* (2013) 57 Cal.4th 899, 924.) We find no such abuse of discretion here.

As defense counsel told the jury at the start of his closing argument, the case was all about motive. Pedroza did not dispute that he stabbed each of the three victims during the altercation at the park; rather, the issue for the jury to decide was whether Pedroza did so in defense of his own life. Pedroza testified that his only intent that evening was to have a fistfight to settle the ongoing issues with Chris, that he had no intention to use deadly

14

force when they got to the park, and that he took out his knife only once he began to fear for his own life.

As an initial matter, there is no real dispute here that the rap video that the prosecution played for the jury was relevant to disprove that defense. Therein, Pedroza stated that he was upset that he was not there to protect Chris, that he hated his rivals (who beat up Chris), that they had to pay, and that he wanted to "crack them." Those statements were probative as to intent and motive. Pedroza does not argue otherwise on appeal. Rather, he contends only that the written lyrics were not so probative, and should have been excluded.

As the prosecutor conceded, there was at least some evidence that the written rap lyrics were "not as close in time to the crime," and they did not specifically reference Pedroza's desire to retaliate for Chris being beaten. Nevertheless, they did reference Pedroza's loyalty to the Hoodlums, his willingness to kill his enemies, and, as relevant here, given the facts of the alleged crime, "packing a filero" (a knife), and being "quick to stick" or stab someone. Pedroza testified that he wrote the lyrics sometime around 2016, but he also said that he wrote the lyrics to the rap video around the same time, that Chris had already been jumped at that time, and that "there were always problems" with these individuals. Thus, there was evidence that the "enemies" referenced in the written sets of lyrics were the same 380 Block members that "jumped [Pedroza's] homie," as stated in the rap video.

When viewed together, in context of the other evidence, the written rap lyrics were written relatively close in time to either the charged crimes or the rap video, and both related directly to the motive as they discussed the ongoing rivalry with 380 Block. Accordingly, we cannot say that the trial court abused its discretion when it concluded that the written lyrics were

15

probative of Pedroza's intent. (*People v. Coneal* (2019) 41 Cal.App.5th 951, 969 (*Coneal*) ["where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased"]; *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35 ["lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards [a rival gang]*,* go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions"]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372−1373 [rap lyrics properly admitted as relevant to gang membership, loyalty to the gang, and motive and intent on the day of the shooting].)

In this same context, we also cannot conclude that the trial court abused its discretion by concluding the written rap lyrics were not overly prejudicial. The written lyrics were no more offensive and certainly evoked no more emotion or gang-related prejudice than the four-minute video that the prosecutor played for the jury, in which Pedroza himself rapped about killing his enemies, and hating the "fools" that "jumped [his] homie."

### 4. The Introduction of Section 352.2 Does Not Change Our Analysis

Pedroza notes that the Legislature recently added section 352.2—effective January 1, 2023, just months after Pedroza's convictions and sentencing—specifically to "to address the problem of introducing racial stereotypes and bias into criminal proceedings by allowing rap lyrics into evidence." (*People v. Venable* (2023) 88 Cal.App.5th 445, 454, review granted May 17, 2023, S279081 (*Venable*).) He contends that even if we conclude, as we do, that section 352 did not render the written lyrics inadmissible, section 352.2 applies retroactively, and precludes the admissibility of the written lyrics in this case.

16

As Pedroza acknowledges, there is a split in authority as to whether section 352.2 applies retroactively; another panel of this court has concluded section 352.2 does not apply retroactively, and the issue is currently before the California Supreme Court.  (See *Venable, supra,* 88 Cal.App.5th at pp. 454−458, review granted [concluding that section 352.2 applies retroactively]; *People v. Ramos* (2023) 90 Cal.App.5th 578, 596, review granted July 12, 2023, S280073 (*Ramos*) [concluding that section 352.2 does not apply retroactively].)  Particularly in light of our high Court's recent analysis and conclusion in *People v. Burgos* (2024) 16 Cal.5th 1, that section 1109, which provides defendants with a right to a bifurcated trial free of prejudicial gang enhancement evidence, does not apply retroactively, we are inclined to agree with our colleagues in *Ramos* that section 352.2 likewise does not apply retroactively.

Regardless, in our view, and for many of the same reasons already discussed, it is likely that the trial court would have reached the same conclusion and found the written lyrics admissible, even under the new framework set forth in section 352.2.

Section 352.2 provides, in relevant part:

> "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal

17

disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings.

"(b) If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony."

(§ 352.2, as added by Stats. 2022, ch. 973, § 2, eff. Jan. 1, 2023.)

According to the Legislature, the purpose of section 352.2 is "to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1; see also, *Venable, supra,* 88 Cal.App.5th at p. 455, review granted.)

Here, for the reasons discussed *ante*, the rap video was not vague or circumstantial evidence of intent, nor was it offered as character or propensity evidence; rather, Pedroza was rapping specifically about his desire to retaliate against 380 Block for jumping his friend, Chris, and his willingness to stab his rivals with a knife, which is precisely what happened.

Pedroza asserts that the written lyrics were not "close in time" to the charged crime and did not bear a sufficient level of "similarity to the charged crimes." (§ 352.2, subd. (a).) But, as we have explained, Pedroza testified

18

that he wrote both songs sometime around 2016, suggesting that both addressed the same subject matter, and the prosecution submitted evidence suggesting Pedroza wrote the written lyrics within a year of the crime. Further, although not presented to the jury, Sergeant Mandelleh's opinion as to the timing was based on a reference to juvenile hall, from which Pedroza was released shortly before the charged crimes. Thus, there was at least some period between the writing of the lyrics and the crime during which Pedroza had a limited ability to seek the retribution he wrote about. We see no reason that the trial court could not consider that fact in evaluating the "near in time" aspect of the section 352.2 framework.

Finally, although section 352.2, subdivision (b) was not yet controlling, the trial court nonetheless permitted Pedroza to present testimony from his own expert witness who discussed the genre of gangster rap and the culture surrounding it, including the fact that young men often tried to imitate or glamorize the gangster lifestyle to appear tough. The jury was able to weigh this evidence along with Pedroza's own testimony, in which he stated that he "didn't mean much" when he wrote those lyrics, and was just trying "to write a rap like everyone else," when evaluating the significance of the lyrics. The trial court also addressed the potential for racial bias by instructing the jury that it could not let bias based on race or ethnicity influence its decision. We presume the jury followed that instruction. (*People v. Jone*s (2011) 51 Cal.4th 346, 371 (*Jones*).)

### 5. Any Error in Admitting the Written Lyrics Was Harmless

For these same reasons, we would likewise conclude that any error in admitting the written rap lyrics was harmless, even under the more stringent *Chapman* standard. (See *Chapman v. California* (1967) 386 U.S. 18, 26.)

19

Pedroza asserts the error was prejudicial for three reasons. First, he asserts that the evidence supporting the prosecution's case was not overwhelming, as evidenced by the jury returning a conviction of second, rather than first, degree murder. There is no dispute that this case came down to Pedroza's intent, but there was also ample evidence that Pedroza went to the park that night with the intent to start a fight. He testified that he only intended to start a fistfight, but he also conceded that he took a knife to that fight. Moreover, there was evidence of consciousness of guilt, including Pedroza's own admissions that he fled the scene, burned his clothes, and threw the murder weapon into the ocean. (See *People v. Haynes* (1967) 253 Cal.App.2d 1060, 1065 [effort to conceal or destroy evidence demonstrates consciousness of guilt].) Finally, that the jury convicted him only of second degree murder suggests that they did not convict Pedroza based simply on preconceived notions of gang membership.

Second, Pedroza asserts there was an inherent danger that the jury would use the rap lyrics as character evidence. On this point, we do not disagree. However, this is always the case with such evidence, and the very reason for the introduction of section 352.2. Here, for the reasons we have explained, it appears the trial court properly considered this risk and found the probative nature of the evidence outweighed the risk. And, as noted, the trial court permitted Pedroza to present his own evidence as to the importance or meaning of the lyrics. Regardless, the gang rivalry was the alleged motive in this case, and there was ample evidence concerning Pedroza's membership in and allegiance to the Hoodlums, the culture of respect and retribution within such gangs, and the role of the rivalry in the altercation that lead to the murder.

Third, Pedroza asserts the prejudice was amplified by the prosecutor's reliance on the rap lyrics at trial. To the contrary, and with the exception of the two references to the written lyrics that Pedroza highlights on appeal, the prosecutor relied almost exclusively on the rap video, as opposed to the written lyrics. More importantly, though, the prosecutor did not rely on the lyrics as evidence of Pedroza's violent character (see *Coneal, supra,* 41 Cal.App.5th at p. 971), but instead, argued appropriately that they were evidence of his motive and intent on the day of the murder.

For the foregoing reasons, we conclude the trial court did not err in admitting the written rap lyrics, and that, even if it had, any such error was not so prejudicial as to require reversal.

### B.     The Trial Court Did Not Abuse Its Discretion by Excluding Expert Testimony on Adolescent Brain Development

Pedroza next asserts the trial court abused its discretion by excluding the testimony of his proffered expert on adolescent brain development, Dr. Kristina Malek. We conclude that Pedroza has not established an abuse of discretion.

#### 1.  Additional Background

Prior to ruling on the admissibility of Dr. Malek's testimony, the trial court held a hearing pursuant to section 402, outside the presence of the jury.

Dr. Malek stated that she would testify generally about adolescent brain development, but clarified that she had not spoken to Pedroza personally and did not intend to offer any opinions as to his personal ability, or capacity, to form the requisite specific intent for murder. She explained, "I am here to testify about the adolescent brain. The developments that take course over the adolescent time period, specifically the connectivity of the brain as it relates to the frontal lobe, the immature limbic system, and the nucleus accumbens." She said that adolescents—like Pedroza, who was 18

years old at the time of the alleged crimes—typically operate under heightened stress and arousal, and are more likely to engage in high-risk or reward-seeking behaviors without anticipating the consequences of their actions. The trial court asked if she had previously testified as to these topics in a murder case and she explained that she had testified in hearings pursuant to Welfare and Institutions Code section 707 to determine whether a juvenile should be tried as an adult, but not in an adult murder case.

At the conclusion of the hearing, the prosecutor asked the court to exclude Dr. Malek's testimony and asserted it appeared to be an attempt to assert an improper diminished capacity defense. In response, Pedroza's counsel stated that he would not be offering a diminished capacity defense, but that the testimony was relevant because the charged crimes required specific intent. He explained, further that Dr. Malek would not be testifying that either Pedroza or teenagers as a class had diminished capacity; "she is giving expert testimony to this jury, saying there is a difference [in] how they process information."

After taking a break to conduct its own research, the trial court found that the proffered testimony was not relevant, at least to the legal liability phase of the trial. The trial court noted that the testimony might be relevant when considering the aggravating factors for sentencing, but concluded it was not relevant as to guilt, and would be confusing to the jury under section 352. It therefore granted the prosecution's objections, excluded the testimony as to the guilt phase, and noted that, should the case go to a bifurcation on the aggravating factors, it would find the evidence relevant for that purpose.

### 2. Standard of Review

To be admissible, expert testimony must be " '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would

assist the trier of fact.' (Evid. Code, § 801, subd. (a).) 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.' (Evid. Code, § 720, subd. (a).)' " (*People v. Watson* (2008) 43 Cal.4th 652, 692.) Expert testimony is *not* admissible if it relates to a subject of common knowledge to persons of ordinary education or if it is not relevant to a material fact in the case. (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1227; *People v. William*s (2008) 43 Cal.4th 584, 633.)

The trial court has broad discretion in deciding whether to admit or exclude expert testimony. (*People v. McDowell* (2012) 54 Cal.4th 395, 426). We review the trial court's decision as to the admissibility of expert testimony for an abuse of that discretion. (*Ibid.*; accord, *People v. Pearson* (2013) 56 Cal.4th 393, 443 (*Pearson*).) In doing so, we do not substitute our own judgment for that of the trial court and "[w]e do not consider whether a trial court reasonably could have admitted the expert opinion evidence in this case. Our only inquiry [as a reviewing court] is whether the trial court's decision to exclude the expert opinion testimony constituted an abuse of discretion." (*McDowell*, at pp. 428, fn. 22, 429-430.)

### 3. The Trial Court Did Not Exceed the Bounds of Reason by Concluding Dr. Malek's Testimony Was Not Relevant

There is no dispute that Pedroza's defense centered entirely upon his mental state at the time of the stabbings. He asserts that the trial court erred in excluding Dr. Malek's testimony for this reason, and that courts have frequently permitted expert testimony in murder cases where the defendant asserts a defense of perfect or imperfect self-defense.

23

It is true that courts generally permit evidence regarding how a specific defendant's mental illness or prior traumatic experiences may have impacted his or her mental state at the time of the charged crimes. (See *People v. Coddington* (2000) 23 Cal.4th 529, 582−583 ["An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation"]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088−1089 (*Humphrey*) [evidence of battered women's syndrome relevant to self-defense]; *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 747 [evidence of homelessness heightened sensitivity to threats after being repeatedly subjected to threats of violence and actual violence relevant to demonstrate individual's subjective perception of an imminent threat].)

But in this case, Dr. Malek did not examine Pedroza or review any records related to his mental health or upbringing, and she explicitly stated that she did not intend to testify as to Pedroza specifically. Rather, she intended only to discuss adolescent brain development *in general*. As the trial court concluded, that evidence was not relevant to Pedroza's legal culpability, or guilt. Rather, it seemed to be aimed at establishing a legally impermissible defense that all adolescents have a diminished or otherwise limited capacity to form the requisite specific intent for murder. It is well established that an expert cannot testify as to the ultimate legal issue of whether a defendant had the required mental state. (See Pen. Code § 29 ["In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice

24

aforethought, for the crimes charged"]; *People v. Pearson*, *supra*, 56 Cal.4th at p. 443.)

In *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), on which Pedroza relies, the United States Supreme Court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Id*. at p. 479.) In reaching that conclusion, the Court reiterated from a line of earlier cases that "children are constitutionally different from adults for *purposes of sentencing*[,] [b]ecause juveniles have diminished culpability and greater prospects for reform." (*Id*. at p. 471, italics added.) As Pedroza points out, the court noted that a youthful defendant's chronological age, background, and mental and emotional development must all be considered "in assessing his [or her] culpability," but it did so in the context of discussing sentencing, not guilt. (*Id*. at p. 476.)

Likewise, in 2017, the Legislature amended section 3051, increasing the age of individuals afforded a youth parole eligibility hearing from 23 to 25, "such that offenders serving a determinate or life sentence for crimes committed when they were 25 or younger are now eligible for a youth offender parole hearing." (*People v. Acosta* (2021) 60 Cal.App.5th 769, 777.) Both *Miller* and section 3051 address the level of punishment appropriate for minors, *not* their criminal culpability at the guilt phase of trial. Thus, although we in no way doubt the veracity of Dr. Malek's proposed testimony, we find no error in the trial court's explanation that the differences between youthful and more mature minds she intended to discuss would be relevant as to sentencing, but not guilt.

Finally, Pedroza relies on *In re Moore* (2021) 68 Cal.App.5th 434, in which the court found that it was appropriate to consider the defendant's youthfulness in determining whether there was sufficient evidence that he

25

acted with "reckless indifference" following the landmark Supreme Court cases *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522. Notably, the court in *Moore* did not address the admissibility of expert testimony in this context. Rather, the court held that it could consider the " 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences' "—as one factor in the totality of circumstances it considered in determining whether Moore, who was only 16 at the time of the charged felony murder, acted with the requisite reckless indifference to human life. (*Moore,* at p. 454.) As the court there suggested, it is commonly understood that these features often result in impulsive and "ill-considered actions and decisions." (*Roper v. Simmons* (2005) 543 U.S. 551, 569.)

To the extent Dr. Malek intended to extend this reasoning to suggest that Pedroza's youth diminished his ability to form the requisite specific intent for the charged crimes, we cannot conclude that the trial court abused its discretion by excluding that testimony. Nor did the exclusion of the testimony preclude the defense from arguing that the totality of circumstances, including Pedroza's youth, impacted his subjective perception of danger or threat to his own life.

## C. Statements Regarding Self-Defense During Closing Arguments

Pedroza's next contention is that the prosecutor repeatedly, and improperly, argued during his closing that a defendant has a right to self-defense only against the specific individuals in a group that are actually inflicting force upon the defendant.

### 1. Additional Background

During closing argument, the prosecutor stated, "For self-defense it's the person that you use force against, that person has to be attacking you and

26

putting you in imminent danger of death and great bodily injury. 5'5", 120-pound Kyle without a weapon in his hands is not death or great bodily injury." He then pointed out that Pedroza said he just had his head down and started swinging the knife, and argued that if an individual, like Pedroza, really thought he was going to die, "isn't he going to be looking at the people that are attacking him? Is there anything else that his focus is going to be on?"

Defense counsel then argued, "this case is about escalation. It's about starting something with nondeadly force and then getting it back at you and getting it back at you hard. And any of those, a group beating, a five-on-one beating of gang members, that's deadly force. Being assaulted by a car, having a car coming straight at you, that is deadly force. And then having been subjected to another group beating out in the street now with a bat by gang members, that's deadly force. Later, he addressed the prosecution's argument and stated, further, "There is absolutely no requirement in the law where someone who's getting assaulted like that says to everyone, 'All right. Stop. Back up. The guy who hit me – or tried to run me over with the car, raise your hand.'" He told the jury, "that's not realistic and that's not the law."

The prosecutor returned to the argument during rebuttal and told the jury, "Because someone else might have driven a car, that doesn't mean that he can go and stab Kyle. It's separate. You have to use self-defense against the person that's doing force on you, doing bad things to you." He asserted further that the injuries sustained by the victims were not consistent with Pedroza's statement that he was just swinging the knife wildly. He continued, "question is what were those people doing to Mr. Pedroza? And specifically, what were the people who used deadly force doing? [¶] Because

you can only use deadly force against the person that is using deadly force against you. You can't use it as an excuse. Someone attacks me, so I'm going to stab him. That's not how it works. [¶] If someone attacks me with deadly force, I have to respond to that person with deadly force not just anybody that was in the group, anybody that was in the park."

At that point defense counsel objected and asserted the prosecutor's argument misstated the law "as to the group." The trial court responded, "With that, you'll have to refer to the jury instructions, ladies and gentleman," and the prosecutor continued his argument. The court provided the jury with the standard instructions on lawful self-defense, sudden quarrel or heat of passion, and imperfect self-defense.

## 2. General Principles and Standard of Review

Prosecutors have wide latitude to argue their case vigorously during closing arguments but may not use deceptive or reprehensible methods to persuade the jury. (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*); *People v. Tully* (2012) 54 Cal.4th 952, 1009–1010.) It is improper for a prosecutor to misstate the law generally, even if the misstatements are not made in bad faith. (*People v. Bell* (2019) 7 Cal.5th 70, 111.) "Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*Ibid.*) "Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*Ibid.*)

However, " '[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or

28

erroneous manner.'" (*People v. Dykes* (2009) 46 Cal.4th 731, 771–772 (*Dykes*).) When reviewing the prosecutor's statements on appeal, we do not infer that the jury drew the most damaging meaning possible but consider how a reasonable juror would, or could, have understood the allegedly improper comments in the context of the entire argument. (*Ibid.*; *People v. Benson* (1990) 52 Cal.3d 754, 793.) We also consider the instructions to the jury, which typically carry more weight with a jury than argument. (*People v. Mendoza* (2007) 42 Cal.4th 686, 703.)

### 3. Forfeiture

Before turning to the merits, we briefly address the People's claim that Pedroza forfeited this argument by failing to object during the prosecutor's initial closing argument. As the People assert, to preserve a claim of prosecutorial misconduct for appeal, defense counsel must make a timely objection and request an admonition to cure any harm in order. (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) Here, defense counsel did object, albeit during the prosecutor's rebuttal. He did not seek an admonition, but the trial court had already stated the jury would need to refer to the instructions on that point. In our view, it was reasonable for defense counsel not to expect the court to provide any further admonition at that point.

Regardless, Pedroza argues in supplemental briefing, in the event we agree that his trial counsel forfeited the argument, his trial counsel provided ineffective assistance of counsel. Rather than address the ineffective assistance of counsel claim, we exercise our discretion to reach the merits of Pedroza's argument regarding the prosecutor's remarks. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [court may exercise discretion to consider forfeited claims to forestall ineffective assistance of counsel arguments].)

### 4. The Prosecutor's Argument Does Not
### Require Reversal

Pedroza asserts the prosecutor misstated the law when he argued that Pedroza was not permitted to use deadly force against the person or persons that were using deadly force against him. He argues that there is no such requirement in the law on self-defense, and that the focus is instead on whether the defendant actually believed, reasonably or unreasonably, that the immediate use of deadly force was necessary to defend against an imminent danger. Considering the totality of the arguments, and the instructions to the jury, we conclude that Pedroza has not shown " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Dykes, supra* 46 Cal.4th at p. 772.)

As noted, the trial court instructed the jury using the standard instructions on self-defense, sudden quarrel or heat of passion, and imperfect self-defense. Pedroza does not assert that these instructions were erroneous in any way, and we presume that the jury followed the instructions. (See, *Jone*s, *supra,* 51 Cal.4th at p. 371.) Further, when defense counsel raised an objection to the argument, the trial court indicated that the jury would need to refer to those instructions. Although not a traditional admonition, this certainly suggested to the jury that they should consider the law as stated in the instructions, and not as argued by counsel.

Consistent with those instructions, a defendant can claim self-defense if they "actually and reasonably believe[d] in the need to defend" themselves from imminent danger. (*Humphrey, supra,* 13 Cal.4th at p. 1082.) To be exonerated completely, the self-defense must be perfect, meaning that the defendant's belief must have been both objectively and subjectively reasonable. (*Ibid*.) "If the belief subjectively exists but is objectively

*unreasonable*," it is imperfect self-defense and the defendant may be convicted of manslaughter, but not murder. (*Ibid*., italics added.) Typically, in such cases, the central issue for the jury is the reasonableness of the defendant's subjective beliefs. (*Id*. at pp. 1082–1083.)

Here, the prosecutor's remarks called into question both Pedroza's credibility in asserting that he had a subjective fear of imminent harm, as well as the reasonableness of that asserted subjective belief. In the context of the entire argument and the instructions, it is not likely that the jury concluded Pedroza could not defend himself if he reasonably believed that he was in danger of imminent harm from the group. Rather, as the prosecutor stated, Pedroza could not use the actions of one individual as "an excuse" to kill another. Nor could he use deadly force by just wildly swinging a knife without any regard to what his alleged attackers were doing. To be considered self-defense, the use of deadly force had to have been in response to an actual threat of imminent harm. And, at the same time, defense counsel asserted that, under the circumstances, Pedroza could not simply stop the fight to determine who to defend himself against.

Pedroza relies on *People v. Breverman* (1998) 19 Cal.4th 142, in which the California Supreme Court held that trial courts have a sua sponte obligation to fully instruct the jury on all lesser necessarily included offenses supported by the evidence. (*Id*. at pp. 148–149.) Applying that rule, the Court held further that "there was substantial evidence to support a heat of passion theory of voluntary manslaughter, and the instant trial court should therefore have instructed on this theory." (*Id*. at p. 149.) In doing so, the court clarified that the bar for instructing is relatively low; courts do not weigh the evidence or make credibility determinations, they simple consider

whether there is any substantial evidence which would support the theory. (*Id.* at pp. 162–163.)

The court then explained, "Here, there was evidence that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon domestic property occupied by defendant and acted in a menacing manner. This intimidating conduct included challenges to the defendant to fight, followed by use of the weapons to batter and smash defendant's vehicle parked in the driveway of his residence, within a short distance from the front door. Defendant and the other persons in the house all indicated that the number and behavior of the intruders, which defendant characterized as a 'mob,' caused immediate fear and panic. Under these circumstances, a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition." (*Breverman, supra*, 19 Cal.4th at pp. 163–164.)

The Court did not address the question of whether, and to what extent, a defendant must harbor fear against a specific attacker in a group assault situation to establish a claim of either perfect or imperfect self-defense, nor did it comment on any argument presented to the jury regarding the same. It simply concluded there was enough of a factual question to require that the jury be instructed. Here, the jury was instructed on all applicable theories and both the prosecutor and defense counsel were entitled to argue their case based on the evidence presented at trial and the instructions presented to the jury. Accordingly, *Breverman* does not suggest, as Pedroza asserts, that the prosecutor's argument in this case was improper.

### D. Cumulative Error

Pedroza asserts, even if none of the individual alleged errors are sufficient to require reversal on their own, the cumulative effect of the alleged

errors does require reversal.  The cumulative error doctrine applies when "the cumulative effect of the errors . . . makes[s] it 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s].' " (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141; see also *Hill, supra* 17 Cal.4th at p. 847 [concluding sheer number of errors was so troubling as to require reversal].)  Here, we have found no individual errors and, thus, there is no cumulative error.  Further, for the reasons discussed herein, even if there were any individual errors, those errors were not prejudicial, individually or because of the cumulative effect.

## III.

## DISPOSITION

The judgment is affirmed.


KELETY, J.


I CONCUR:


McCONNELL, P. J.

CASTILLO, J., Concurring.

I concur in the opinion of the court.

I write separately to emphasize I would decide the first issue—whether the trial court abused its discretion in admitting the written rap lyrics—"upon the narrower, and fully dispositive, ground" that, on the facts of this particular case, their admission was harmless. (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 414 (conc. & dis. opn. of George, C.J.).)

Crucially, Luis Mondragon Pedroza "does not dispute the admissibility" of the rap video recorded mere weeks before the murder, which, like the contested written rap lyrics, proclaimed Pedroza's allegiance to the El Cajon Hoodlums gang, concerned Pedroza's fellow gang member Chris being "jumped," and indicated a willingness to fight and kill. (Maj. opn., at pp. 12-15.) As (1) the retroactivity of Evidence Code section 352.2 is presently before our Supreme Court (see *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2023, S279081), and (2) a video is more likely to inflame a jury's passions than inanimate written words, on this record I would dispose of this issue solely by concluding the admission of the lyrics, even if erroneous, was not prejudicial.

CASTILLO, J.